Good morning. May it please the Court, I've asked to reserve seven minutes for rebuttal. My name is Keith Slienkiewicz. I represent the appellant in this case, Transcontinental. The trial court's decision represents a dramatic expansion of alter ego law. The trial court imposed alter ego liability despite the fact there was no harm to the alter ego claimant, and there was no benefit to the... I thought they would own the CD company, basically, and they didn't, because all the stock was spirited out, all of it. Either this roughly 60% that was transferred for a dollar or two, or the 40% that was pledged. Your Honor, 100% of the stock was pledged in order to secure a... 60% was pledged by the company that it was spirited out to, as I recall, and the 40% was pledged by the company that confessed to the $5 million judgment. There was 100% of the shares were pledged before there was ever any transfer of shares. There were two separate transactions. And so you conclude that there was no harm to SOFTBANK because they never had anything that they could get anyway. No, Your Honor. The undisputed facts were that if the share pledge had not occurred, and if the share transfer had not occurred, Amerikdisk would have gone bankrupt. And the undisputed evidence was that if that bankruptcy occurred, all the equity sitting in MPO Canada, which is the equity that SOFTBANK could have executed against, would have been wiped out by the bankruptcy court. That was all undisputed. So the only alternative to bankruptcy in the record before the trial court was that these transactions, which were implemented to keep that bankruptcy from happening, the Amerikdisk was in default on $60 million worth of a credit facility. It was default on those loans. It was losing money at the rate of several million dollars a month. All testimony was completely consistent that if these transactions had not happened, Amerikdisk would have gone bankrupt. These transactions were administered to avoid that from happening. The bank syndicate, who was owed $60 million and who was threatening to foreclose on that debt, which could not be paid, only agreed and would only agree to extend its credit facility and, in fact, to allow another $60 million of financing to come into the company to allow for a reorganization and turnaround. Are you suggesting that all of this that took place, the reorganization, had absolutely nothing to do with the litigation? Absolutely, Your Honor. Absolutely. And there's no evidence to the contrary. And the district court had to make findings in relationship to that and found to the contrary. The district court's decision, and it is distasteful as it is to say this, virtually none of the statements the district court makes characterizing the transactions is supported by any evidence. The district court does make a statement that, it pulled this out of some arguments made by SoftBank in the briefing, that the transactions were structured in part to avoid the debt, the SoftBank debt. Where that comes from was a line of questioning that SoftBank asked the two witnesses. And basically the questioning was this. MPO Canada was a holding company. It sat on top of AmeriDisc. MPO Canada was the company that had the guarantee. They had the obligation to SoftBank. The questioning would be this. Well, isn't it true that when you reorganize these companies or when you reorganize AmeriDisc, I'm sorry, when you reorganize AmeriDisc, you could have voluntarily taken on that $6 million of debt sitting in MPO Canada? And the answer to that was the individuals who were agreeing to come in and constitute the turnaround team, the three individuals who were being asked and who were given the stock in order to do that said, no, we won't do it that way. We're not going to voluntarily take on this extra $6 million of debt. Why would we do that? This company is worthless. It's going bankrupt. And we are being asked to come in here and turn it around. And why would we then agree, in addition to that debt, to accept voluntarily another $6 million that wasn't ever AmeriDisc's debt? So, yes, the individuals who were being asked and being induced to come in and turn this company around and implement a very painful reorganization, they ended up closing half the facilities, firing half the employees, said, no, we will not, as a negotiating point in these transactions, we will not agree to accepting that $5 million of debt and adding that to the $60 million of debt we're already taking on. Now, SoftBank, in its very incendiary briefing, says, well, you see, the transaction was specifically structured to avoid that $6 million debt. No, that's not what happened. The individuals who were being asked that were independent, completely independent from Transcontinental, us, or MPOSA, the other shareholder, refused to accept the term which would voluntarily give them another $6 million of debt. We received no benefit of that, and we didn't ask for that provision. That was asked for by these new managers who were going to come in and be the turnaround team for this company. So, if I understand your argument, the findings made by the district court are clearly erroneous? They are clearly erroneous. In fact, essentially all the findings describing the transactions are clearly erroneous. We focused on three of those findings in our briefing, and those were the findings that all the stock was transferred, which the trial court says. Your Honor mentioned the pledging. The trial court never mentions the pledging, and I'll talk about the pledging if Your Honor wants to, but the trial court never mentions it. Reading it in the indulgent way that we're obligated to under clearly erroneous review, I think we have to assume that he understood the difference but regarded it as immaterial because pledging the stock meant all the stock was gone just as selling the stock for a nominal amount would make it gone. Well, the stock isn't gone. Forty percent of that stock remains in the company and has never been executed again. It's pledged. It's pledged, Your Honor, but if you think that through, what that means, you know, a company, the fact that the stock was pledged only to secure an existing debt of AmeriDisc. So, AmeriDisc had a $60 million fee. Who were the people who were induced now to do the turnaround but will only do it if they don't have to take on the debt? That was the three individuals. Those two of them were existing officers of AmeriDisc. All the other officers had fled because the company was about to go bankrupt, and one was an outside turnaround artist that was brought in to do this. Now, those three individuals were being asked to implement the reorganization plan. They couldn't be paid. AmeriDisc didn't have money to go give them big cash grants to incentivize them coming in. The only thing that could be given was shares of stock, and they insisted on having control of the company. If they were going to invest in coming into this wreckage of this company and try to turn it around, they have. They've turned the company around, and that has been successful. The trial court is essentially saying in its decision that these business individuals don't have the authority to make those kinds of judgments. Why couldn't the same turnaround have been accomplished if the creditor, SoftBank, had gotten all the stock and then made the deal with the two officers of AmeriDisc and the turnaround artist? That's a great point, and I'd like to talk about that because if you think about it, because it made noise, and, of course, the trial court made no findings about the pledge, so we don't know what the trial court was thinking about the pledge. But this was debt that existed in AmeriDisc. If you take the example of let's say the company was worth $100 million because it had $50 million of assets. It had $50 million worth of value in it. It had buildings and equipment that were worth $50 million, and it had an operating value, an ongoing concern value of $50 million, meaning that an investor would be willing to come in and pay, say it was making a profit of $5 million a month, might be willing to come in and say that's worth to me to pay $50 million now to get that going concern value of the company, of a profit of $5 million a month. Those two things combined come to $100 million. Now, an investor who might come in and buy those shares, let's also say that that same company has $60 million of debt, and now that company pledges the shares of the company to secure that $60 million. An investor who comes in to buy those shares doesn't care because the investor can come in and buy that company in two ways. One, it can pay that $60 million of debt off, remove that lien, and that's all it is. It's a lien on the shares for whatever that debt is outstanding. Or, and then pay $40 million for the rest of the company debt-free, or it can come in and pay $100 million for that company and assume that $60 million of debt. It does not matter that that debt is pledged to the shares. It simply doesn't matter in terms of the value of that company. So that's not what has been interfering with SoftBank's ability to execute on its judgment. Those shares are still there. If there is positive value above the company's debt, that has been there to execute against all along, and SoftBank has chosen not to execute against it. The problem is the shares aren't worth anything. A minority interest in a non-publicly traded company, which is subject to a lien, I mean, it has a minority interest in an untraded company subject to a lien is worthless, even if the company as a whole has considerable value. There was no evidence in the record of that, Your Honor. That may be the case, but the trial court — Do you need evidence of it? I mean, I think that — It's like it's just common knowledge. It's ordinary. The fact is that no effort was ever made to execute on those shares. We don't know what the court would have done in forcing that company to be sold. Fairbanks, Alaska, organized this corporation. Are you going to pay a nickel for 20 shares of it that's encumbered when there are 100 shares outstanding? It would be silly. Well, Your Honor, we're talking about an extreme remedy here of alter ego in a transaction that admittedly was no harm to SoftBank because they have to show they would have gotten some benefit. Doesn't there have to be some evidence that but for these actions, SoftBank would have been able to recover its judgment? And the evidence isn't there because the company had no value. By definition, those shares aren't worth anything until they have positive value on top of their existing debt. And that has never occurred yet. It's starting to happen. Because of the business decisions that were made to do these things and the millions and tens of millions of dollars that my client put into this reorganization to make it work, that company may return to value and SoftBank may be able to recover its judgment. But the trial court is saying that private business persons don't have the opportunity to make those choices. And that's where the fault lies, and that's where the real danger of the court's decision is. If there is no evidence of harm in the record to the party-seeking alter ego, that they're worse off because of the transactions in question, then there's not any fraud and there's not any injustice. And that is what all the cases say. There's another thing that all the cases say, all the cases that involve fraudulent transfers. And there are the cases that SoftBank cites as well as the cases that we cite. And they say you have to follow the money. And that only makes sense because if shares, if something's transferred out of a company and that something had value and now the judgment creditor can't go get that something, it only makes sense that the party who has received that benefit of that is the party who has made the alter ego. And in this case, there is no evidence that Transcontinental, my client, received any of this value. There was a pledge to a bank syndicate, five independent Canadian bankers, who negotiated for a pledge on the basis that there was a $60 million credit facility in default, and they weren't going to keep that going unless they got something and they had to be secured. That was the only way to get that in place, to keep this company alive. Counsel, before you sit down, I know you wanted to reserve some time. Would you address the real party and interest argument and tell me what difference it makes? What's the difference between the real party and interest argument that SoftBank has made and the alter ego finding by the district court? Well, this is a hazy area because there's not been a lot of law on this. But the bottom line is that Transcontinental was never served a summons. They've never been formally brought into the action. There is this legal doctrine, alter ego, that allows a trial court to deem that that party was already there all along. And Judge Ware, in this case, applied that doctrine to hold that the shareholders, Transcontinental and NPOSA, were essentially de facto in the litigation all along. But that finding, if it's not supported by the evidence, and we don't believe it is, we believe that essentially everything Judge Ware found was wrong, then that party has never been party to this litigation. Is that the point you were concerned about? Yeah. Is there a legal difference between the alter ego conclusion the district court draws and the real party and interest argument, which was also made in which the district court may or may not have alluded to? I misunderstood the question. I apologize. That's the fraud on the court doctrine. And that says that where the party, and there are several cases that talk about that doctrine, that says that where the party has been in the case all along but lied about the fact that they were who the true defendant was. And these cases are cases where. . . And is it necessary in order to get to that real party and interest to conclude that there has been fraud on the court? Yes, there has to be perjury that sitting in the courtroom saying, yes, I'm the one that owns that apartment building that you were hurt at, and then, in fact, it was somebody else who owned that building, and we don't find that out until after. . . It's not sufficient, then, that you have a parent company that has been bankrolling the whole thing and directing the litigation for some kind of a wholly owned subsidiary. No, Your Honor. Under that, under the alter ego doctrine, to impose all. . . That's fraud on the court doctrine we were just talking about. The alter ego doctrine requires both control and no difference between the two parties. And that there be a fraud or injustice. And that's universal in all the cases. Tell me if I have this right structurally. The district judge thinks that what happened is in substance, though it's more complicated than this and not these exact words. The MPO Canada people, transcontinental people, said, don't consent to the judgment until we get a merit disc out of there. The transcontinental argument on appeal is it doesn't matter, because a merit disc had no value when they got a merit disc out of there. The district judge makes a finding of fact, yes, it did. It had very substantial value. As close as I can come is the testimony about the book value. I don't know exactly what the value is, but it was not valueless. And the response of transcontinental is that's plainly erroneous. It was valueless. Have I got it right? Well, that's plainly erroneous. All the stock was not transferred, so there's still retained. If there was value, if it was worth $11 million, if that's true, then there remains to be about $5 million sitting in that. In fact, it's increased because the company's gotten more valuable. So it's internally inconsistent with the trial court found. But that's correct. There was no competent evidence of value, and we extensively briefed that issue. The only competent evidence that was submitted, and it was overwhelming, was that nobody would pay a penny for this case, for this company. The only offer that was received from America's shares during a yearlong effort to sell those shares, the only hard offer that was received was we will give you 60 cents on the dollar for your debt. In other words, if you can talk your banks into writing off 60% of their debt or 40% of their debt, we'll take your company for free. That was the only offer they got in effect. And they had an investment banker trying to sell this company for a year. And it was just getting worse. The company was losing more and more money. And, again, the evidence is uncontradicted that it would have gone bankrupt. So the question that the trial court never asked and had to ask under these cases is, would SoftBank have been better off had these individuals who were involved in this transaction allowed Americas to go bankrupt? And the answer is, under the evidence before the court, absolutely not. Thank you, counsel. I know you want to save some time. Thank you. Good morning, Your Honor. May it please the Court. My name is Michael Steinberg of Sullivan and Cromwell, and I represent SoftBank Content Services. I'd like to focus in my argument to discuss three separate items. First, I'd like to put the chronology together of what happened and why it was so imperative for Transcontinental to play a shell game with the assets of MPO candidate Frustrate SoftBank. Second, I'd like to describe the transactions that Transcontinental orchestrated with a focus on the most remarkable document in this case, the so-called Shareholders Agreement of Amerikdisk that was entered into on the very same day that MPO Canada consented to the judgment, a shareholders agreement that is particularly ironic in view of the fact that two of its signatories supposedly are not even shareholders of Amerikdisk, and yet it is a shareholders agreement of Amerikdisk. Third, the District Court correctly interpreted the law and applied them to the facts that it observed at a live hearing where Amerikdisk and Transcontinental appeared and were cross-examined. First, by the time that MPO Canada consented to the judgment, things had gone from bad to worse. iLogistics, who was the original obligor, had already filed for bankruptcy, making MPO Canada liable to SoftBank for up to a $6 million guarantee. iLogistics had defaulted on a second payment to SoftBank, rendering the amount due even more substantial. MPO Canada owed in excess of $120,000 to the special master who had been set up to address certain accounting issues. MPO Canada's counterclaims had been dismissed by the trial court on motion, MPO's request for an interlocutory appeal had been denied, and the trial court had set up further conference to discuss MPO Canada's failure to pay the special master. The trial date was rapidly approaching. The day of judgment was upon MPO Canada. On October 31st, MPO Canada consented to a judgment. On that very same day, a series of transactions were consummated and completed. First, MPO Canada canceled the preferred stock holdings that it had in AmeriDisk, which had a face value of $18 million plus an accrued dividend of $1.2 million. For that cancellation, not a nickel went to MPO Canada, even though it held that debt. Second, despite the fact that MPO Canada was the 100% shareholder of AmeriDisk, AmeriDisk itself, the subsidiary, issued greater than 475,000 shares of stock outside of MPO Canada directly to Transcontinental and its partner, all for the purchase price to Transcontinental of $1. Transcontinental, in turn, turned around and sold those shares for $2 to the supposed new investors, who were neither new nor truly investors. Second, Transcontinental and its partner kept for themselves an option to repurchase all of those shares for just $1 each. Finally, Transcontinental had previously permitted MPO Canada's shareholdings in AmeriDisk to be subject to this $125 million lien. And even though MPO Canada was never a signatory on the AmeriDisk debt, MPO Canada was directed by Transcontinental and its partner to use those shares that it held of AmeriDisk as collateral for this loan that it was never a party to, ever. To effectuate these transactions, MPO Canada itself had no independent representation. Instead, Transcontinental, principally Monsieur Poirier, at one time wore eight different hats on the closing on October 31st. There was not an arms-length transaction in sight here. And despite the references to investment bankers and the like, there was not a single appraisal. There was not a fairness opinion. There was nothing. There was a reshuffling of these assets with the direct goal of impeding SoftBank. And SoftBank, of course, was kept entirely out of the loop. Counsel, you seem to be a little short of questions from the bench on the points you've been raising so far. I wonder if I could ask you about a different point that interests me in the case. Please. On the attorneys' fees. Yes. About all I know about them is that yours were three times as high as the other side's. I don't know how many hours for the different ranks of lawyers and paralegals, and I don't know what the hourly rate was. Is that right? No. The hours were actually identified in the declaration. Okay. So I can figure the hours. I didn't see any final compilation, so many hours for this paralegal, so many for that attorney. But you're saying if I went through the bills, I could at least figure out the hours. Let me say what was provided to the district court on the issue of fees. There was a — there have been three principal lawyers working on this case since its inception. Me, Mr. Parris, who's with me, and who was at the time an associate, and at some time a junior associate. Those items, we gave a close partner. You had a partner. You had an associate. And who was the third one? We had another associate who was on for some of the case. Partner and two associates and some paralegals, as I recall. There was one paralegal, principally. Okay. And was the rate of each of these persons disclosed? No. No. Sullivan and Cromwell does not have hourly rates, which was what we explained to the district court. Oh, did you have an affidavit or something? We just don't have hourly rates? Yes. We indicated that we — we indicated the total amount of hours that were billed. We indicated the total amount. We indicated that the client had paid. But you don't do it the old-fashioned way for legal services, $50,000. We still are — But you don't do it the 70s way, .3 tenths of an hour at $80 an hour. It is not — Sullivan and Cromwell does not believe that it is the amount of hours spent, but it is the results achieved that should be valued. So you disclose the hours, but you don't have a rate. No. So there can't really be a lodestar calculation. No. And under Rule 69, the trial could — we're talking about a practice and procedure under California practice and procedure. Why shouldn't the judge then, in terms of figuring a reasonable rate, look at the roughly half-million dollars that the lawyers for the other side charge and figure that the way litigation works is somebody hits the ball to you, you have to hit it back. And they depose, you have to prepare and cross-examine. You depose, same deal. It tends to be roughly equivalent. You won. Maybe that means you did better. Maybe it means you actually did less work because you had an easier case. Maybe the results justify a higher rate. But still look at their half-million dollars as a way to start. Certainly, Your Honor. You can start with that. But Mr. Slankovich's firm was only one of four different firms that it represented. Mr. Slankovich — The half-million isn't adding all of the firms up. No, it's not. And it's — no, it's not. And it's unclear if those amounts were even paid or what was billed. It was the affidavit that was filed specifying that figure was very opaque on that. And I would — I don't know if it matters whether it's paid or billed. If you do $20,000 worth of work and your client doesn't get around to paying you, it's still $20,000 worth of work. Although the client might say that it wasn't worth that much, which may be a relevant consideration. But let me address one other slight point Your Honor made. It takes much more work to uncover a fraud than it does to defend it. And in this case, all of the documents that we were provided after four separate motions to compel were written in French. This required — I am somewhat of an okay restaurant orderer, but this required some greater assistance and required some greater time to go through these documents and to figure them out. We did not have access to any of the principles except through deposition. So we had to literally try to put together these series of transactions all written in French documents and trying to understand the money flow between them and trying to understand the corporate issues that each of those transfers would relate to. We had to engage a forensic accountant. They would not have to engage such. It was a time-consuming task and one not made easy by their lack of cooperation in discovery. Let me back up to something. Before law firms, the way I understood it, the defendants in this case changed law firms several times. Yes. We're not talking about different law firms for different defendants. We're talking about the predecessor law firms. Correct. Right. So we only have the bill from the last one? Exactly. We do not have the bill from Kirkland & Ellis. We do not have the bill from Langlois. We do not have the bill from Steichman Elliott. So all we know is the last firm in line charged a half million bucks. Exactly. Langlois. Sounds like they would know French. They do know French and they were from Quebec and they were trying to interfere with our ability to obtain. There was a series of French people who showed up and told us that we were crazy and that we should not proceed. Happens in litigation. It does. And in this case, we were able to expose the multiple different hats and the non-arm's length transactions. I wanted to answer, I wanted to point to two things. And Judge Bybee raised the question of, related to whether or not there's a difference under the Levander standard and alter ego. And Levander is very clear in footnote 11 of that case that indicates that California has had a split, or actually still does have a split, whether on a motion to amend after judgment, one must actually prove alter ego. And the Ninth Circuit in Levander indicated that its prediction of what the California Supreme Court would do on that point was that it would not require actual alter ego. So, Levander has a somewhat lower standard than actually finding alter ego. And in fact, but it is made up for that by the contemporaneous requirement that control of the litigation by the parent be shown. In Levander as well, I would like to note that it isn't as counsel for Transcontinental has said, it's not a follow the money issue. Because in Levander, Levander there was first a transfer by the corporation to 19 different people. Those 19 people, for a dollar, those 19 people in turn transferred it to a partnership. That partnership in turn transferred it to somebody else. So by the time the court was dealing with the issue, the partnership added to the amended judgment in Levander had also sold its interest. So we do not have to go after 3858. That is not what it says. And the reliance upon the fraud on the court element of Levander was an independent and different basis. That was a question of whether or not this court has the inherent authority to transfer the, to amend the judgment because of a fraud committed in the court. But there was a second ground under 69A and the amendment provision of California law that was an independent basis for that determination in Levander. And I would say as well, the notion, I would like to address one factual point that is nowhere in the record. Mr. Slankovich says that, and I believe he said that there was tens of millions of dollars put into AmeriDisc. And the way in which he said it, I took it to indicate that this was after the transaction. Nothing, there is certainly nothing in the record of that. While Transcontinental had invested money into MPO Canada and actually avoiding MPO Canada, they just invested it directly into AmeriDisc. All of that was completed months before the transactions at issue here, months before the shell game that was played. So in this case, Judge, the district court had significant evidence of value. There was the notion that this company was valueless, was not borne out by the record, and it wasn't borne out by AmeriDisc's own financial statements. While they want to strike the evidence provided by Mr. Strong, who was certainly unqualified to read these financial statements, even if you toss out Mr. Strong's testimony, and there's absolutely no basis to do that, Mr. Strong was amply supported by their own auditor, Monsieur Valeron, who testified at his deposition that the reason why the write-downs had occurred just a few months before these transactions was there had been a reorganization and it was the obligation of the company, in this case AmeriDisc, to provide its best estimate of its value. And there's a record site for that, and I apologize for not having it, but the Valeron testimony is quoted extensively in our brief. I did want to focus on one particular element because it is Transcontinental's suggestion in this case that Judge Ware was completely out to lunch and nothing could have been further from the truth. And I'd like to point, Your Honors, to, as I said in the beginning of my argument, the most remarkable document in the case, which is the agreement among shareholders. It appears at the supplemental excerpts of record at page 261. Now, this is an agreement that is dated on October 31st, the very same day that MPO Canada consented to the judgment. And this is an agreement of the shareholders of AmeriDisc. Now, I would remind the Court that as of October 31st, because of the two transfers, the only shareholders literally of AmeriDisc at that moment in time were MPO Canada, who still held 40% of that, and 3858, the so-called new investors, who had roughly 60%. But this agreement among shareholders, which I've marked up extensively, is actually between 3858, Transcontinental, MPO Canada, Inc., 3093, which was MPO SA, and Disc Amerique. So, first of all, the parties to this shareholders agreement were not even shareholders. But that didn't give them any pause whatsoever, because they defined shareholders in paragraph two to signify, quote, all the people who hold shares in the company, including, when context so permits, Transcontinental and MPO Holdco, and who are parties to the present agreement. Now, what is particularly amazing about this shareholder agreement, aside from lopping in people who weren't shareholders, was that the control of MPO Canada, which Transcontinental did not have any interest in, supposedly, nor did MPO Holdco, each of them got to elect one member of the three-member board of directors of AmeriDisc. So the two parties who didn't have any interest whatsoever in AmeriDisc were actually able to appoint two of the three board of directors members. MPO Canada, who actually did hold 40% of the stock, got to appoint none. But M. Poirier, acting on behalf of MPO Canada, as it says on the front page, acquiesced to this on behalf of MPO Canada. And it gets worse. So you have the supposed 40% position of MPO Canada, which then gets imputed to GTC, or Transcontinental, and then they get, actually, a majority of the board of directors. But, again, it gets worse than that. Because not only do they have the power to control, but they have the power to dilute MPO Canada's remaining 40% interest at will. Paragraph 8 of this shareholder agreement has a series of preemptive rights. In other words, if AmeriDisc is to issue any more stock, you've got to give stock to the existing shareholders. And that's set forth in the paragraph 8.1 of this agreement. And remarkably, what paragraph 8.1 says is that, I'm sorry, it's actually paragraph 8.2. The shareholders, again, a defined term that includes Transcontinental, undertake not to subscribe to any additional shares in the capital stock of the company, AmeriDisc, unless the preemptive rights is granted to all the shareholders. Now, that's a remarkable thing. You're all of a sudden having preemptive rights that are no longer going to the shareholders. But what is worse is, MPO Canada has, because they've stripped it, no assets. So if all of a sudden, AmeriDisc wants to dilute MPO Canada down further, all they have to do is issue more shares. If they issue more shares, MPO Canada can't buy any, but Transcontinental can, and MPO Holdco can, and 3858 can. And they can do this until we're whittled down to a zero interest, .001. They could — they have the absolute power to dilute the interest down further. So why did we not — and going back to your question, Judge Kleinfeld, why not go after and seize them? Because they had the power to wipe us out at any moment whatsoever. And that's why this document is so remarkable. I'll also mention one other thing. They indicated before the district court that the springing option, the option to repurchase all of the shares provided at 3858, didn't exist. And then it was a drafting error. And then who knows what else it was. But I would take your honor to paragraph 7-6 of the shareholder agreement, which deals with the — 7.6. 7.6. It's at SER 269. And now, again, this is an agreement among all the shareholders. And paragraph 6 of the letter of understanding is where that springing option occurred. And they testified at the hearing and in prior submissions to the court that that option just never existed. But because the transaction slightly changed, and they say, so the transaction slightly changed, therefore the option went out of existence. But in paragraph 7.6, it says, to clarify, the rights conferred to the shareholders in light of the present article 7 are subordinate to the rights detailed in paragraph 6 of the letter of understanding. The only way that they would trust 3858 to get the stock was if they had the right to recapture it. And they say that this right didn't exist. Now, it's possible that this right lapsed. Maybe they changed their plans. Maybe they were successful. But the fact is, is that they had this right, and they had the ability to dilute down and control Amerikdis, taking that control, taking those ownership interests out of the hands of MPO Canada, which was SoftBank's. SoftBank, if you believe their tale, the $5 million judgment that SoftBank had would have been sufficient for SoftBank to own all of the stock of MPO Canada, and therefore own all of the stock of Amerikdis. Counsel, your time has expired, so you ought to wind up. I would just say that what MPO, what Transcontinental did in this case was take its subordinate position as equity holders to a legitimate judgment creditor and did everything they could to wipe out that judgment creditor. Thank you, Your Honor. Thank you, Counsel. Counsel, before I get into the merits, Your Honor, I have, I've talked with the clerk before. We have a motion to strike. Much of the record that Your Honors have from SoftBank is not, was not actually before the trial court. And we filed a motion to strike those portions of the record. We know that. Okay. I don't know what the outcome or what happens with that at this stage. You rule on it when we rule on it. The, I was hoping to hear some, some response to the point which you've made throughout this case of how SoftBank was worse off because of the transfer, how it would have been better off for the bankruptcy to have happened. And I didn't hear an answer, and there never has been an answer, because the evidence in the record before the trial court was undisputed that if a, there was $40 million more debt than there was assets in Amerikdis. That is undisputed. It's at the record. That's at ER 130. And if a liquidationist came from the bank syndicate's liquidation specialist who was giving this information to the bank, if bankruptcy happened, because what happens in a bankruptcy is that your creditors are paid off, you sell the assets, whatever creditors are paid off, $40 million worth of creditors would not have been paid off, and all the equity being held, 100% of the equity being held in NPO Canada would have forever been wiped out. All of that evidence is undisputed. And I was hoping to hear some answer as to how SoftBank would be better off if Transcontinental and NPO Canada and NPOSA and the five banks that were involved and the investment bankers that were involved and the management group that was involved, if they had not negotiated a deal to keep the company financed and to keep it from going into bankruptcy by reorganizing it. And I didn't hear an answer. That is a fatal problem for upholding the trial court's decision. Because what it says is that trial courts can get into the business of micromanaging business persons who are doing something. Wasn't there evidence that you disagree with Mr. Strong as to the value of the company of $11 million? There was some evidence. You said there's no evidence. He testified. We've had an extensive discussion in the brief. He testified that he saw book value. No, you disagree, but you made the comment there's no evidence. Well, there is evidence. You just don't agree with it. Okay. Well, no, that's not evidence related to bankruptcy. That's evidence that if, because the evidence was undisputed that bankruptcy would have happened if that credit facility were pulled and if the reorganization were not implemented. That evidence is undisputed. So we're talking, what Mr. Strong was saying was that there was a book value in which we all understand is different than a market value of $11 million. But Mr. Strong did not refute that the bankruptcy would have happened. And that's the evidence that nowhere is refuted in the record. The trial court pays no attention to. By the way, all these things that were just said, the trial court mentions none of them. And they were all future contingencies that SoftBank has gone through and picked out bits and pieces from a three-month long, very vigorous negotiation between a whole bunch of different interests. You're over your time, so you ought to wind up. Okay. Well, let me close with saying this. Why this case is dangerous, on top of the fact that the court didn't find any, there wasn't ability to find any harm to SoftBank through the conduct that's being complained of, is that the court effectively rewrote a guarantee. The guarantee in this case was issued by MPO Canada, and the court effectively, by its decision, extended that guarantee up to the shareholders. Now, at the time that guarantee was executed, SoftBank, as a sophisticated commercial entity, could have put terms into that guarantee, which prevented all the things that have happened in this case, the transfer, the share pledge. Could have said, you can't pledge shares, you can't transfer shares out of MPO Canada. Very common term in a guarantee. You can't touch the assets that are backing up our guarantee. It didn't do that, and now the trial court's coming in after a whole series of individuals and companies have taken steps to save a company from bankruptcy and substituted its judgment and basically rewritten that guarantee. That's not something that was present in any other case. Thank you, counsel. SoftBank v. Transcontinental is submitted, and we are adjourned for the day.
judges: Wallace, Kleinfeld, Bybee